## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

**ARK LABORATORY, LLC,**                Case No. 23-43403-MLO Chapter 11

      Debtor.                Hon. Maria L. Oxholm

_____/

**JASON W. BANK, solely in his**
**capacity as Successor Trustee**
**of the Ark Laboratory Trust,**

              Plaintiff,                Adv. P. No. 23-04496-MLO

v.

**JAMES A. GROSSI, an Individual,**
**2210/305 LLC, a Michigan limited liability**
**Company, BRIAN TIERNEY,**
**Individually and as Trustee of the**
**TIERNEY FAMILY TRUST DATED**
**12/21/2018, NAMEER KIMINAIA,**
**Individually and as Trustee of the NAMEER**
**KIMINAIA LIVING TRUST DATED 5/31/2019,**
**TIERNEY FAMILY TRUST DATED**
**12/21/2018, NAMEER KIMINAIA**
**LIVING TRUST DATED 5/31/2019,**
**HAMID SATTAR, ION DIAGNOSTICS, LLC, a**
**Michigan limited liability company, and ION**
**MARKETING, LLC, a Michigan limited liability**
**company,**

      Defendants.

_____/

## FIRST AMENDED COMPLAINT

1

Jason W. Bank, solely in his capacity as Successor Trustee of the Ark Laboratory Trust ("Successor Trustee") and as plaintiff in the above captioned adversary proceeding ("Adversary Proceeding"), by his attorneys, Taft, Stettinius & Hollister, LLP, hereby alleges, upon his own knowledge or information and belief, as follows:

## PRELIMINARY STATEMENT

1.     This Adversary Proceeding arises out of the greedy and unlawful actions of three individuals – the owners and managers of a medical testing laboratory – to strip the entity of more than $20 million solely for their personal enrichment and benefit, while ignoring and abdicating their fiduciary duties of care and loyalty owed to the entity, thereby precipitating the filing of a chapter 11 case, in which there are insufficient assets to pay over $50 million in claims filed by creditors.

2.     This Adversary Proceeding seeks, among other things, to recover for damages caused by various individuals and entities that include current and prior managers of Ark Laboratory, LLC ("Ark" or the "Debtor") in connection with a membership redemption transaction and breaches of fiduciary duties of care and loyalty owed to the Debtor and/or aiding and abetting breaches of such fiduciary duties by the defendants in connection with the redemption transaction.

3.     In addition, the Successor Trustee seeks to avoid and to recover all transfers made in connection with the Redemption (defined below) as fraudulent transfers pursuant to section 544(b) of title 11 of the United States Code (the

"Bankruptcy Code") and the Uniform Voidable Transactions Act, M.C.L. § 544.31, *et seq*.

4. The Successor Trustee asserts that James A. Grossi ("Grossi"), the former manager, Chief Executive Officer ("CEO") and President of the Debtor, violated his fiduciary duties with respect to the management and operation of the Debtor, both prior to and subsequent to the Redemption.

5. The Successor Trustee seeks to set aside and to avoid various transfers made to Grossi, an insider of the Debtor (as defined under section 101(31) of the Bankruptcy Code) and/or 2210/305 LLC ("2210/305"), also an insider of the Debtor, for (i) preferential transfers pursuant to section 547 of the Bankruptcy Code, (ii) fraudulent transfers pursuant to sections 544(b) and 548 of the Bankruptcy Code and the Uniform Voidable Transactions Act, M.C.L. § 544.31, *et seq*, and (iii) unauthorized post-petition transfers pursuant to section 549 of the Bankruptcy Code.

6. The Successor Trustee seeks equitable relief against Grossi pursuant to sections 105 and 510(c) of the Bankruptcy Code as a result of his unlawful, inequitable and unjust conduct that injured the Debtor.

7. Finally, the Successor Trustee also contends that the compensation, plus additional amounts paid to Grossi by the Debtor, were excessive, and therefore, the Successor Trustee is seeking to set aside and to avoid all such excessive payments as an

additional fraudulent transfers under sections 544(b) and 548 of the Bankruptcy Code and the Uniform Voidable Transactions Act, M.C.L. § 544.31, *et seq*.

8.     As a result of all of the acts described above, the Debtor became insolvent, thereby leading to the filing of the above captioned chapter 11 case and leaving insufficient assets to pay the Debtor's creditors in full.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

10.     Venue is proper in this district under 28 U.S.C. § 1409(a) as this Adversary Proceeding is related to Case No. 23-43403 (the "Chapter 11 Case"), a bankruptcy case under chapter 11 of the Bankruptcy Code that is pending in this district.

11.     This Adversary Proceeding is commenced pursuant to Bankruptcy Rule 7001(1), and arises under sections 105, 510(c), 544, 547, 548, 549 and 550 of the Bankruptcy Code, and applicable state law.

12.     Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

## PARTIES

13.     Pursuant to the *Findings of Fact, Conclusions of Law and Order (I) Granting Final Approval of the Debtor's Disclosure Statement and Plan Supplement, and (II) Confirming Debtor's Second Amended Plan of Liquidation* entered on

4

December 1, 2023 [ECF No. 392] (the "Order of Confirmation"), the Ark Laboratory Trust ("Liquidating Trust") was established. The Liquidating Trustee was appointed to administer all of the assets, including Preserved Causes of Action and Avoidance Actions (as defined in Article I.B., paragraphs 7 and 14 of the Plan), that were conveyed to the Liquidating Trust. All conditions set forth in Article VII.A of the *Second Amended Plan of Liquidation* [ECF No. 413] (the "Plan") were satisfied on December 14, 2023; thus, the Effective Date of the Plan (as defined in Article I.B.35 of the Plan) occurred on December 14, 2023. On the Effective Date, all of the assets of the Debtor, including the Preserved Causes of Action and Avoidance Actions, were transferred to, and vested in the Ark Laboratory Trust and Paul R. Hage, as the Liquidating Trustee, became the sole representative of the Debtor's estate. On July 2, 2024, this Court appointed Jason W. Bank as the Successor Trustee of the Ark Laboratory Trust [ECF No. 644] and, as a result thereof, the Successor Trustee is now vested with the authority granted under the Liquidating Trust Agreement.[1] As a result thereof, the Successor Trustee is the party who has standing to pursue the claims against the Defendants set forth in this First Amended Complaint.

---

[1] On May 29, 2024, Paul R. Hage provided notice that he intended to resign from his role as the Liquidating Trustee as part of the winding down of his legal practice due to his appointment to serve as a bankruptcy judge in this Court.

14.     The Debtor, a laboratory that provided medical diagnostic testing, such as toxicology, hematology, chemistry, immunochemistry, urinalysis, coagulation, PCR, PGX and other testing services, filed a voluntary petition for chapter 11 bankruptcy relief under the Bankruptcy Code on April 12, 2023 (the "Petition Date").

15.     Defendant Grossi is a Michigan resident. Upon information and belief, Grossi became a member of Ark on July 1, 2015.

16.     Defendant 2210/305 is a Michigan limited liability company, owned and controlled by Grossi and whose resident agent is Grossi. 2210/305 was the recipient of certain transfers by the Debtor described in more detail herein below.

17.     Defendant Nameer Kiminaia, a/k/a Norman or Norm Kiminaia ("Kiminaia") is a Michigan resident. Kiminaia was the trustee of the Kiminaia Living Trust dated 5/31/2019 (the "Kiminaia Trust").

18.     Upon information and belief, from October 1, 2017 until January 19, 2021, Kiminaia or the Kiminaia Trust was a member of Ark.

19.     Defendant Kiminaia Trust is a trust formed under the laws of the State of Michigan with the same address as Kiminaia.

20.     Kiminaia was also a manager of the Debtor until January 19, 2021.

21.     Kiminaia and the Kiminaia Trust are insiders of the Debtor as defined under sections 101(31)(B)(1), (ii) and (iii) of the Bankruptcy Code.

22.     Defendant Brian Tierney ("Tierney") is a Michigan resident. Tierney was trustee of the Tierney Family Trust dated 12/21/2018 ("Tierney Trust" and, collectively, with the Kiminaia Trust, the "Trusts").

23.     Defendant Tierney Trust is a trust formed under the laws of the State of Michigan with the same address as Tierney.

24.     Upon information and belief, from October 1, 2017 until January 19, 2021, Tierney or the Tierney Trust was a member of Ark.

25.     Tierney was also a manager of the Debtor until January 19, 2021.

26.     Tierney and the Tierney Trust are insiders of the Debtor as defined under sections 101(31)(B)(1), (ii) and (iii) of the Bankruptcy Code.

27.     Defendant Hamid Sattar ("Sattar") is a Michigan resident. Sattar was the sole member of the Debtor until approximately June 30, 2015, when he transferred a portion of his membership interest to Grossi and Tierney and, thereafter, on or about October 1, 2017, Sattar transferred his remaining interest in the Debtor to Kimanaia.

28.     Defendant Ion Diagnostics, LLC ("ID") is a Michigan limited liability company, whose resident agent is Kiminaia. Upon information and belief, ID is owned and/or controlled by Tierney and Kiminaia. ID was the recipient of certain transfers by the Debtor described in more detail herein below.

29.     Defendant, Ion Marketing, LLC ("IM") is a Michigan limited liability company, whose resident agent is Kiminaia.  Upon information and belief, IM is owned

and/or controlled by Tierney and Kiminaia. IM was the recipient of certain transfers by the Debtor described in more detail herein below.

## BACKGROUND AND STATEMENT OF FACTS

**A.  Formation and Company Governance**

30.    The Debtor was formed by Sattar on or about June 29, 2012.  Upon information and belief, Sattar operated the Debtor as the sole member and sole manager until Grossi and Tierney joined Ark as members on or about July 1, 2015.

31.    Upon information and belief, Sattar did not receive any consideration when he transferred two-thirds of his membership interest equally to Grossi and Tierney. Moreover, there were no written agreements memorializing the sale of Sattar's membership interest to Grossi and Tierney; nor was an operating agreement prepared to reflect the addition of Grossi and Tierney as new members of Ark in 2015.

32.    Notwithstanding that no amended operating agreement was executed when Grossi and Tierney joined Ark, upon information and belief, after Grossi and Tierney joined Ark, Sattar, Grossi, and Tierney each held equal one-third interests.

33.    On October 1, 2017, Kiminaia joined Ark by acquiring Sattar's remaining one-third membership interest in Ark.

34.    Upon information and belief, at the time that Sattar transferred his remaining interest to Kiminaia, Sattar did not receive consideration for the transfer. Moreover, there were no written agreements memorializing the sale of Sattar's

8

membership interest to Kiminaia. Notwithstanding, upon information and belief, Sattar received installment payments from the Debtor up to the date of the Redemption after he transferred his interests to Grossi, Tierney, and Kiminaia.

35.     On December 31, 2018, Tierney formed the Tierney Trust and transferred his one-third membership interest in Ark to the Tierney Trust.

36.     On January 8, 2019, Grossi formed 2210/305 and transferred his one-third membership interest in Ark to 2210/305.

37.     On May 19, 2019, Kiminaia formed the Kiminaia Trust and transferred his one-third membership interest in Ark to the Kiminaia Trust.

38.     Accordingly, after the transfers reflected above, the Tierney Trust, the Kiminaia Trust and 2210/305 were the members of Ark, as reflected in the *Second Amended and Restated Operating Agreement* dated June 25, 2019, with an effective date of January 1, 2019 (the "2019 OA") that was prepared by Nofar Law, PLLC ("Nofar Law").

39.     Pursuant to Section 5.1B of the 2019 OA, Grossi, Tierney, and Kiminaia, individually, were each designated as the managers of the Debtor (collectively, the "Managers").   The 2019 OA was subsequently amended and restated on January 1, 2021, pursuant to a *Third Amended and Restated Operating Agreement* (the "2021 OA") to reflect Grossi as the then sole manager of the Debtor.

40.     When Grossi joined Ark, he was designated as the CEO and President. He remained in this position until sometime in 2021, when he hired Luis Perez ("Perez") to serve as the new CEO and President of Ark.

41.     Sometime later in 2021 or 2022, Grossi terminated Perez and reassumed the position of CEO and President of Ark and remained in these positions through the Petition Date.

42.     According to the 2019 OA, when Kiminaia joined Ark, he served as a manager of Ark, held the title of Chief Financial Officer ("CFO") and was primarily responsible for maintaining the Debtor's financial books and records.

43.     According to the 2019 OA, when Tierney joined Ark, Tierney served as a manager of Ark.

44.     Section 5.3F of the 2019 OA requires that Managers "conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all Company funds and assets, and the use thereof for the exclusive benefit of the Company."

45.     Section 9.1 of the 2019 OA requires the Company and its Managers to maintain various books and records, including minutes of any meeting of Manager(s) or Members and written consents to actions by Manager(s) or Member(s).

46.     Upon information and belief, the Managers and Members failed to maintain minutes of meetings or written consents.

47. Section 12.1B of the 2019 OA provides that as follows:

> <u>Certificate of Value Alternative</u>: The purchase price of the Interest Value shall be the value of the Membership Interest as set out in the most recent and still valid Certificate of Value. The original Certificate of Value is attached hereto as Exhibit B. The Members agree to meet (which can be at a regularly schedule Members meeting) for purposes of renegotiating and executing subsequent Certificates of Value at intervals of not more than 12 months from the execution date of the preceding certificate. The value to be set forth in the subsequent Certificate of Value shall be determined by unanimous vote of the Members. A Certificate of Value shall be valid for no longer than 12 months, and if a subsequent Certificate of Value has not been executed within 12 months of the prior certificate, then the purchase price shall be the fair market value of the Membership Interest determined as of the date of the Triggering Event by an appraisal . . .

48. Upon information and belief, the Members failed to meet at regular intervals of not more than 12 months from the preceding certificate to agree upon value to be contained in a subsequent Certificate of Value or to otherwise issue a subsequent Certificate of Value.

## B. The Redemption Transaction

49. Sometime in 2020, Grossi determined that he wanted to become the sole member of Ark and communicated his intentions to Tierney and Kiminaia.

50. Upon information and belief, Tierney and Kiminaia agreed to transfer all of the Trusts' membership interests in Ark to Grossi, conditioned on Grossi's ability to structure a transaction within ninety days of Grossi's initial proposal to Tierney and

11

Kiminaia, under which their interests would be redeemed by the Debtor (the "Redemption").

51.     In order to structure the Redemption with Tierney and Kiminaia, Grossi hired BeaconView Advisors, LLC ("BeaconView") to prepare and to compile Ark's financial statements into a *Confidential Information Memorandum* ("CIM") that could be used to determine the consideration to be paid to Tierney and Kiminaia and as a marketing document to solicit equity lenders to finance the Redemption with Tierney and Kiminaia.

52.     Upon information and belief, Grossi never received, evaluated, nor reviewed the CIM, let alone the financial data contained therein, when it was prepared by BeaconView or prior to BeaconView seeking financing for the Redemption.

53.     Thereafter, Grossi, Tierney and Kiminaia met and determined that they were willing to go forward with the Redemption if Grossi could raise funds in an amount that would pay Kiminaia and Tierney, collectively, at least $15 million.

54.     Thereafter, BeaconView utilized the CIM to market and to solicit equity lenders to finance the Redemption and, as part of such efforts, identified Peninsula Capital Partners, LLC ("PCP"), a private equity funder, as a party that could assist in financing the Redemption through its subsidiary, Peninsula Fund VII, LP ("Peninsula"), known in the industry to fund equity buyout transactions in collaboration with senior debt lenders.

55. Upon information and belief, either BeaconView or Peninsula recruited Comerica Bank ("Comerica," together, with Peninsula, the "Redemption Lenders") to serve as the senior debt lender to finance a portion of the Redemption, with Peninsula as the junior lender.

56. After meeting with BeaconView, Peninsula agreed to finance $9 million of the Redemption and Comerica agreed to finance $6 million of the Redemption (the "Redemption Financing").

57. Upon information and belief, absent the Redemption Financing, the Debtor did not have sufficient capital to enter into and to fund the Redemption.

58. According to the CIM, prepared by BeaconView, Ark's total assets to liabilities for the three years immediately preceding the Redemption was as follows:

> **2018:** $2,176,7000* assets and $1,879,900 liabilities
>
> **2019:** $3,693,200* assets and $2,426,500 liabilities
>
> **2020:** $5,581,900* assets $2,779,800 liabilities
>
> *These figures do not include receivables that were not reported on the CIM.

59. In the month prior to the Redemption authorized by Tierney, Kiminaia, Grossi, 2210/305 and the Trusts (collectively, the "Redemption Defendants"), the Debtor's net equity was approximately $1.7 million.

60. At the end of December 2020, immediately following the Redemption, the Debtor's equity was depleted to a negative value that exceeded $14 million.

13

61.     The Redemption was effectuated by execution of several transaction documents including (a) a *Membership Interest Redemption Agreement* dated December 31, 2020 with an effective date of January 19, 2021 (the "<u>MIRA</u>"); (b) a *Bill of Sale* (the "<u>Bill of Sale</u>"); (c) the *Joint Consent Resolution of the Members and Managers of Ark Laboratory* dated January 13, 2021 (the "<u>Redemption Consent Resolution</u>"); and (d) the *Assignment and Assumption of Membership Interests* dated January 19, 2021 (the "<u>Membership Assignment</u>") conveying the Trusts' membership interests to Grossi (the MIRA, Bill of Sale, Redemption Consent Resolution and Membership Assignment will be collectively referred to as the "<u>Redemption Documents</u>").

62.     Nofar Law purportedly represented the Debtor in the Redemption. Upon information and belief, Nofar Law represented the individuals' interests as well. By representing all of the parties in the Redemption, Nofar Law failed to advise the Debtor and the Redemption Defendants of the risks attendant to consummating the Redemption.

63.     When the Redemption closed on January 19, 2021 (the "<u>Redemption Closing Date</u>"), according to the closing documents for the Redemption Financing, the funding was allocated as follows:

| | |
|---|---|
| A. Company Cash | $     23,497.26 |
| B. Cash to Tierney | $ 7,000,000.00 |
| C. Cash to Kiminaia | $ 7,000,000.00 |
| D. On-Deck Settlement | $     56,953.00 |
| E. Payoff Huntington | $   400,690.45 |
| F. Payoff Sattar | $   346,666.58 |

14

| | | |
|---|---|---|
| G. Peninsula origination & misc. fees | $ | 83,267.71 |
| H. Comerica origination fee | $ | 60,000.00 |
| I. Bodman (Comerica expenses) | $ | 28,925.00 |
| **Total** | | **$15,000,000.00** |

64.     Upon information and belief, BeaconView was paid a service fee for locating the Redemption Financing; however, the payment of its fees was not reflected in the closing documents.  According to Debtor's 2021 profit and loss statement, the Debtor incurred more than $877,000 in transaction costs in 2021, which, upon information and belief, included the payment of service fees to BeaconView.

65.     The Redemption Documents obligated the Debtor to pay more than $16.480 million in cash (the "Redemption Obligations"), comprised of $14 million ($7 million each) to Tierney, Kiminaia and/or the Trusts (the "$14 Million Transfer"), and to issue promissory notes by the Debtor to the Trusts in the amount of $1.240 million due to each (the "Note Obligations").

66.     The $14 Million Transfer was funded by the Redemption Financing as detailed above.

67.     Upon information and belief, pursuant to the Note Obligations, the Debtor remitted $114,009.19 ($228,018.38 in total) in interest only payments each to Tierney, Kiminaia and/or to each of the Trusts in 2021.

68.     Upon information and belief, the Note Obligations were later forgiven by Tierney, Kiminaia, and the Trusts pursuant to an alleged settlement with the Debtor

relating to a dispute over whether Tierney and Kiminaia violated the noncompete terms of the Redemption.

69.    Pursuant to the Bill of Sale, Grossi caused the Debtor to transfer personal property with a value of $390,000 to ID and IM, which are controlled by Tierney and Kiminaia.

70.    Additionally, the MIRA provided for the Debtor's forgiveness of company loans to Tierney, Kiminaia and/or the Trusts in an amount "not to exceed" $355,000 (the "Loan Forgiveness").

71.    At the time of the Redemption, amounts were still owed to Sattar by Kiminaia, Tierney and Grossi in connection with their prior acquisition of his membership interests in Ark. As a condition to the Redemption Financing, the Redemption Lenders required that Sattar be paid in full. Rather than Grossi, Tierney and Kiminaia paying their personal obligation to Sattar, they caused the Debtor to pay Sattar $700,000 (the "$700,000 Transfer"). Of this amount, $346,666.58 was derived from the Redemption Financing with the rest of the consideration paid from the Debtor's cash.

72.    Prior to and concurrent with the Redemption Transfers, Tierney and Kiminaia and/or their Trusts each received four payments totaling $1,000,000 from the Debtor (the "$1 Million Transfers"), as reflected in the Debtor's general ledger as "draws" without any other specification regarding their basis.

16

73. In addition, after the Redemption Closing Date, Kiminaia, Tierney and/or their Trusts each received $225,000, reflected in the general ledgers as "Note Payables – PPP Return of Escrow" (the "$225,000 Transfers").

74. Ultimately, pursuant to the Redemption, the Redemption Defendants caused the Debtor to transfer nearly $18 million in value to Grossi, 2210/305, Kiminaia, Tierney, Sattar, ID, IM, and the Trusts comprised of (a) the $700,000 Transfer; (b) the $14 Million Transfer; (c) the Note Obligations ($2.240 million); (d) the Note Obligation Transfers ($228,018); (e) the Loan Forgiveness ($355,000); and (f) the Bill of Sale ($390,000) (together each of these transfers will be referred to as the "Redemption Transfers").

75. After the Redemption was completed and Tierney and Kiminaia were no longer members, managers or otherwise employed by the Debtor. Notwithstanding, the Debtor paid Kiminaia additional funds in the amount of $222,378 after the Redemption that was designated as "compensation" (the "Post-Redemption Compensation Transfer").

76. The Debtor did not receive any consideration for the Redemption Transfers, nor did Ark receive any other financial or other benefit by virtue of the Redemption Transfers and the Post-Redemption Compensation Transfer; rather, the Redemption Transfers and the Post-Redemption Compensation Transfer harmed the

Debtor and siphoned off funds that the Debtor could have used to support the operation of its business and pay its many creditors.

77.     After the Redemption was completed through the Petition Date, the Debtor's equity never returned to a positive value.

78.     As a result of the Redemption, the Redemption Financing and the costs incurred in connection therewith, the Debtor was saddled with substantial debt and was unable to weather or to adjust to any increased costs or decreased revenues experienced by the business as all of its cash was being swept up and drained by Comerica.

### C.     The Managers' Breaches of Their Fiduciary Duties in Connection with the Redemption

79.     In pursuit of the Redemption, Grossi, Tierney, and Kiminaia ignored "red flags" and put their own self-interest ahead of the best interests of the Debtor.

80.     When negotiating and effectuating the Redemption, none of the Redemption Defendants took into consideration the amount of capital that was necessary to sustain the Debtor's operations.

81.     Upon information and belief, neither Grossi, Tierney, nor Kiminaia independently assessed the methods or means of the valuation of Ark.

82.     Upon information and belief, Grossi, Tierney, and Kiminaia determined the purchase price of the Redemption of each of the members' interests using the "back-of-the-napkin" and an EBITDA calculation of Ark's 2020 revenue, in contravention of

18

the requirement contained in the 2019 OA with respect to valuing the Member's Interests.

83.     Notably, however, the Debtor's 2020 revenue was an outlier as compared to prior and subsequent years when the Debtor operated, in part, due to the inception of Covid testing services that became the Debtor's "flagship product" at that time.  Giving increased emphasis to this new revenue, without considering whether or how long it would continue, resulted in an inaccurate and overly aggressive value by Grossi, Kiminaia and Tierney to the membership interests.

84.     In fact, when the demand for Covid testing *did* decline following the Redemption Closing Date in 2021, the Debtor experienced a drop in revenue by $1 million per month. Due to the Redemption and Grossi's conduct following the Redemption, as further described below, the Debtor was without sufficient capital to manage the drop in revenue caused by the decline in demand for Covid testing.

85.     The Managers knew or should have known that the Debtor was vulnerable to substantial cash flow fluctuations based on the Debtor's past performance, which would make substantial long term debt service obligations difficult for the Debtor to manage.

86.     By depleting all of the Debtor's capital through the Redemption and the Redemption Financing, the Debtor was without sufficient capital to manage cash flow

19

changes due to changes in reimbursement rates that occurred following the Redemption Closing Date.

### D. Ark's Missing Pre-Redemption Payables as Further Evidence of Breaches of Fiduciary Duties

87.     Upon information and belief, Kiminaia withheld payment of approximately $1.5 million in vendor payables (the "Vendor Payables") during the negotiations of the Redemption Financing between and among the Redemption Lenders and the Redemption Defendants.

88.     The Vendor Payables were not disclosed by Kiminaia, nor did they appear in any of the financing disclosures required by Comerica and Peninsula as a condition of authorizing the Redemption Financing.

89.     Upon information and belief, prior to the Redemption, Ark did not conduct regular financial reporting or analysis, and more particularly, did not prepare or maintain an accounts payable aging report.  Rather, accounts payable were tracked and maintained solely by Kiminaia in paper files.

90.     Upon information and belief, neither Grossi nor Tierney inquired about the status of accounts payable as part of operating the business and, as a result, failed to take into consideration the Vendor Payables that Kiminaia failed to disclose.

91.     Upon information and belief, the concealed outstanding Vendor Payables were not discovered until several months after the Redemption Closing Date.

92.     The failure to take into account the Vendor Payables was an obvious error that ultimately harmed the Debtor.

**E.      Grossi's Mismanagement Subsequent to the Redemption**

93.     Following the Redemption, Grossi was the Debtor's only manager.

94.     In his capacity as the Debtor's only manager, Grossi failed to ensure that the Debtor maintained proper books and records and, in particular, he failed to maintain proper medical billing records necessary to ensure that the Debtor collected all amounts due to it for its services.

95.     Grossi failed to monitor and to ensure that accurate claims for testing services were submitted to and paid by insurance payors, Medicaid and Medicare for the Debtor's testing services (collectively, the "Claims"). Moreover, Grossi failed to timely monitor denials of claims or to timely appeal denials of Claims. As a result, the Debtor was unable to maximize recovery of its receivables.

96.     Grossi failed to exercise his business judgment by, among other things, failing to regularly review and to analyze financial reports and information or to consult with professionals so that he could make an independent assessment of the Debtor's financial condition and performance. Instead, Grossi waited for the Debtor's vendors, officers, and employees to alert him to problems.

97. Grossi's failure to exercise his business judgment caused the Debtor to make costly errors and to make expenditures in excess of what the Debtor was able to afford.

**F.     Grossi's Excessive Compensation and Expense Reimbursement**

98. Grossi used the Debtor as his personal "piggy-bank" to fund (a) his excessive compensation in 2021, (b) a private plane for travel to Las Vegas to see a Pistons basketball game with other officers of the Debtor, (c) the purchase of clothes, (d) payment of excessive restaurant and travel expenses, (e) payment of personal services, including a hair salon, and (f) maintaining a suite at Little Caesar's Arena, without consideration of the status of the financial condition of the Debtor at that time or the impact that such expenditures would have on the financial condition of the Debtor.

99. In total, Grossi caused the Debtor to pay him directly, or 2210/305 indirectly, more than and $3.2 million (the "Grossi Transfers"), immediately prior to the Redemption and following the Redemption up to the Petition Date.

100. The Grossi Transfers reflected in the Debtor's general ledger indicate that Grossi spent nearly $1.4 million of Debtor's cash on meals, travel, clothing, haircare, sports and entertainment, as well as other general, undefined expenses, between April 12, 2021 and 2023. Upon information and belief, Grossi failed to submit itemized

expense reports or documentation to support the expenses, prior to seeking their reimbursement from the Debtor.

101.    The Grossi Transfers from the Debtor for the period just prior to the Redemption in December 2020 and through April 12, 2021 aggregated to more than $1.192 million (the "Six-Year Transfers"), and in the two years prior to the Petition Date aggregated to more than $2,165,003.95 (the "Two-Year Transfers"), and within the one-year period prior to the Petition Date, the Debtor transferred $603,282.16 to Grossi, individually or through 2210/305 (the "One-Year Transfers").

102.    Upon information and belief, many of the above described expenses that the Debtor paid at Grossi's direction are the subject of claims by the United States Center for Medicare and Medicaid Services ("CMS") and the State of Michigan (collectively, with CMS, the "Government"), which have alleged that certain of Debtor's expenditures benefited Debtor's clients in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b and its state counterpart, M.C.L. § 752.1004.

103.    Grossi's conduct exposed the Debtor to a qui tam lawsuit filed in the United States District Court for the Eastern District of Michigan by a whistleblower (that is currently being investigated and under seal) and contingent liability in excess of $37 million, as reflected in proofs of claim filed by the Government. *See* Proof of Claim No. 90 and Proof of Claim No. 91, filed in the Chapter 11 Case.

**G.  The Debtor Runs Out of Money and Borrows Additional Funds from Peninsula and then from Grossi.**

104.  Over 2021 and 2022, the Debtor faced several cashflow shortages as a result of the Redemption, the $1 Million Transfers, the $225,000 Transfers, the Post-Redemption Compensation Transfer and the Grossi Transfers and excessive spending. Upon information and belief, in response to the cashflow shortages, the Debtor, after exhausting its credit line with Comerica, borrowed additional operating capital from Peninsula.

105.  Upon information and belief, Comerica and Peninsula at some point in 2022 were unwilling to make additional loans to the Debtor and the Debtor was unable to obtain loans from other lenders.

106.  Upon information and belief, Grossi personally advanced funds to the Debtor and, as of the Petition Date, the Debtor's *Schedule E/F* [ECF No. 55] ("Schedule E/F") identified Grossi as an undisputed, noncontingent, liquidated nonpriority unsecured creditor for "loans" in the amount of $553,000 (the "Grossi Loans").

107.  Upon information and belief, the Debtor never executed a promissory note or other document to memorialize the Grossi Loans.

108.  Upon information and belief, the Debtor did not remit regular payments of principal or interest in the ordinary course to Grossi on account of the Grossi Loans.

109.  Upon information and belief, the Grossi Loans did not accrue interest on the books and records of the Debtor.

110. Notwithstanding that the Debtor described the Grossi Loans as "loans," upon information and belief, the Grossi Loans were not true debt, but rather were capital contributions.

**H.     Grossi's Unauthorized Post-Petition Transfers**

111. Following the Petition Date, the Debtor transferred more than $38,000 to Grossi, individually or through 2210/305 (the "Post-Petition Transfers").

112. According to the Debtor's general ledger, the Post-Petition Transfers were categorized as loan repayments, expense reimbursements and child support payments.

113. None of the Post-Petition Transfers were authorized by the Bankruptcy Code or the Court.

**I.     The Debtor's Demise and the Commencement of the Bankruptcy**

114. As a result of the above-described actions, the Debtor had a net operating loss of over $9 million in 2022. From January 1, 2023 through the Petition Date (April 12, 2023), the Debtor experienced net operating losses of over $3 million.

115. Ultimately, on the brink of the commencement of a state court receivership action against the Debtor by Comerica, the Debtor commenced a bankruptcy case on April 12, 2023.

116. According to the Debtor's petition, schedules, and statements, on the Petition Date, the Debtor had a total of over $11 million in assets and $32 million in

liabilities that included almost $23 million in secured liabilities, without consideration of the approximately $37 million in claims asserted by the Government.

117.    According to the Official Claims Register with the Bankruptcy Court, there are more than $50 million in claims filed against the Debtor's estate.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF 2019 OPERATING AGREEMENT
### (AS TO DEFENDANTS GROSSI, KIMINAIA, TIERNEY, KIMINAIA TRUST AND TIERNEY TRUST)

118.    The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

119.    Prior to the Redemption, the 2019 OA was the applicable governing document of the Debtor.

120.    The 2019 OA was signed by Defendants, Grossi, Kiminaia, Tierney, the Kiminaia Trust and the Tierney Trust.

121.    Upon information and belief, Defendants Grossi, Kiminaia, Tierney, the Kiminaia Trust and the Tierney Trust breached the 2019 OA by failing to, among other things, (i) conduct regular, required meetings, and keep and maintain minutes of the meetings of the Managers and the Members, (ii) prepare and maintain written consents of actions taken, and (iii) annually value the Members' Interests and preparing and adopting Certificates of Value for the Members' Interests (the "Operating Agreement Breaches").

122.  The Operating Agreement Breaches by Defendants Grossi, Kiminaia, Tierney, the Kiminaia Trust and the Tierney Trust constituted an abdication of their duties and responsibilities under the 2019 OA.

123.  By failing to abide with the terms and conditions of the 2019 OA, Defendants Grossi, Kiminaia, Tierney, the Kiminaia Trust and the Tierney Trust were unable to properly assess the appropriateness of entering into the Redemption.

124.  By failing to abide with the terms and conditions of the 2019 OA, Defendants Grossi, Kiminaia, Tierney, the Kiminaia Trust and the Tierney Trust were unable to ascertain a value of the Members' Interests and instead simply used the "back-of-the-napkin" and an EBITDA calculation of Ark's 2020 revenue, in contravention of the requirement contained in the 2019 OA with respect to valuing the Member's Interests.

125.  By breaching the 2019 OA and moving forward with the Redemption and causing the Debtor to make the Redemption Transfers, the Debtor was damaged in an amount exceeding $50 million as a result of these actions committed by Defendants Grossi, Kiminaia, Tierney, the Kiminaia Trust and the Tierney Trust.

126.  Therefore, the Successor Trustee is entitled to a judgment against each of Grossi, Tierney, Kiminaia, the Tierney Trust and the Kiminaia Trust for the Operating Agreement Breaches for an amount to be determined at trial.

## COUNT II
### Breach of Duty of Loyalty Pursuant to
### 11 U.S.C. § 544 and M.C.L. § 450.4404
### (AS TO DEFENDANTS GROSSI, KIMINAIA, TIERNEY,
### KIMINAIA TRUST AND TIERNEY TRUST)

127. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

128. By virtue of Grossi's position as a manager of the Debtor, a fiduciary relationship existed between Grossi and the Debtor.

129. By virtue of Kiminaia's position until the Redemption Closing Date, as a manager of the Debtor, a fiduciary relationship existed between Kiminaia and the Debtor.

130. By virtue of Tierney's position until the Redemption Closing Date as a manager of the Debtor, a fiduciary relationship existed between Tierney and the Debtor.

131. As fiduciaries, under the 2019 OA and Michigan law at M.C.L. § 450.4404, the Managers were required to discharge their duties in a manner each of them reasonably believed to be in the best interest of the limited liability company and not for the purpose of advancing their own self-interests (the "Duty of Loyalty").

132. Each of the Managers breached the Duty of Loyalty by committing the Operating Agreement Breaches and causing the Debtor to authorize the Redemption, which included authorizing the Redemption Obligation, the Redemption Transfers, the Redemption Financing and the $1 Million Transfers, for their own personal gain and

28

benefit. As a result, the Managers committed the Debtor to more than $21 million in secured long term debt liabilities.

133.    The Redemption Obligations, the Redemption Financing, the Redemption Transfers and the $1 Million Transfers provided personal benefits to the Managers and the Trusts only.  The acts of Kiminaia and Tierney stripped nearly $18 million in value from the Debtor for no consideration, and enabled Grossi to use the Debtor's assets and credit to acquire sole ownership and control of the Debtor.

134.    The Redemption Financing, the Redemption Obligations and the $1 Million Transfers were not fair to the Debtor where it saddled the Debtor with obligations, without providing any economic or other benefit to the Debtor.

135.    At the time that the Redemption Documents were executed by the Managers, there was no disinterested manager or member who could approve the transactions.

136.    At the time that the Redemption Obligations and $1 Million Transfers were incurred or made by the Debtor, Kiminaia concealed payables in the approximate amount of $1.5 million from the Debtor's records that would have been relevant information to the Debtor and each of the Managers to determine whether the Redemption was in the best interest of the Debtor.

137.    As a result of the Managers' breach of the Duty of Loyalty, the Debtor has been damaged in an amount that exceeds $50 million.

138.   Therefore, the Successor Trustee is entitled to a judgment against each of Grossi, Tierney, and Kiminaia for their breach of the Duty of Loyalty for an amount to be determined at trial.

**COUNT III**
**Breach of Duty of Care Pursuant to**
**11 U.S.C. § 544 and M.C.L. § 450.4404**
**(AS TO DEFENDANTS GROSSI, KIMINAIA, TIERNEY,**
**KIMINAIA TRUST AND TIERNEY TRUST)**

139.   The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

140.   As fiduciaries, under the 2019 OA and Michigan law at M.C.L. § 450.4404, the Managers were required to discharge their managerial duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the manager reasonably believes to be in the best interests of the limited liability company (the "Duty of Care").

141.   Each of the Managers breached their Duty of Care when they committed the Operating Agreement Breaches, entered into the Redemption, directed the Redemption Transfers and caused the Debtor to make the $1 Million Transfers without conducting proper due diligence regarding the advisability, risks, and benefits to be derived from the transactions, particularly where there was no actual benefit to the Debtor derived from the Redemption.

142.    Each of the Managers breached their Duty of Care because the Redemption Transfers and the $1 Million Transfers rendered the Debtor insolvent. Such transfers were unauthorized transfers pursuant the Michigan Limited Liability Act, M.C.L. § 450.4307, which prohibits a company from making a distribution that would render a company insolvent.

143.    In contemplation of the Redemption Financing, Grossi failed to independently evaluate the Debtor's finances, or the financial information contained in the CIM. Moreover, Grossi *never* reviewed the CIM prior to the Redemption Closing Date, albeit at any time.  As a result, Grossi failed to determine whether, in light of the Debtor's financial condition and the value of its assets, it was in the Debtor's best interest to incur more than $15 million in long term debt obligations to the Redemption Lenders.

144.    The Successor Trustee does not know whether Kiminaia or Tierney were provided with or reviewed the CIM.  Nevertheless, in contemplation of the Redemption Financing, as managers of the Debtor, they should have independently evaluated the Debtor's finances, or the financial information, including that information contained in the CIM, prior to closing on the Redemption in order to exercise their business judgment and to fulfill their Duty of Care to determine whether, in light of the Debtor's financial condition and the value of its assets, it was in the Debtor's best interest to incur more than $15 million in long term debt obligations to the Redemption Lenders.

31

145. Upon information and belief, prior to closing on the Redemption, neither the Debtor, Grossi, Tierney, nor Kiminaia obtained an independent analysis of the impact or effect of the Redemption on the Debtor.

146. Kiminaia concealed the fact that there were $1.5 million in payables outstanding at the time of the Redemption, and therefore, he did not consider and made it impossible for Tierney and Grossi to consider the risks and benefits of the Redemption and the Redemption Financing in light of the Vendor Payables.

147. As a result of Grossi's, Tierney's, and Kiminaia's breach of the Duty of Care, the Debtor has been damaged in an amount that exceeds $50 million.

148. Therefore, the Successor Trustee is entitled to a judgment against each of Grossi, Tierney, and Kiminaia for their breach of the Duty of Care for an amount to be determined at trial.

## <u>COUNT IV</u>
**Aiding and Abetting Breaches of Fiduciary Duties**
**Pursuant to 11 U.S.C. § 544**
**and Applicable Michigan Common Law**
**(AS TO DEFENDANTS THE TRUSTS, 2210/305, ID, and IM)**

149. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

150. A defendant is liable for aiding and abetting a breach of fiduciary duty where (i) a fiduciary relationship exists; (ii) the fiduciary breaches its duty; (iii) the defendant knowingly participates in that breach and gives substantial assistance or

encouragement to the fiduciary; and (iv) the plaintiff's damages were proximately caused by the breach.

151.   Grossi, Tierney, and Kiminaia were the managers of the Debtor at the time of the Redemption and the $1 Million Transfers, and therefore, they owed the Debtor the Duty of Care and Duty of Loyalty.

152.   Grossi, Tierney, and Kiminaia breached their Duty of Care and Duty of Loyalty, as described herein above at Counts II and III.

153.   At the time of the Redemption and the $1 Million Transfers, Tierney was also the trustee of the Tierney Trust.

154.   At the time of the Redemption and the $1 Million Transfers, Kiminaia was the trustee of the Kiminaia Trust.

155.   At the time of the Redemption and the $1 Million Transfers, the Trusts were the beneficial owners of Kiminaia's and Tierney's membership interests in the Debtor.

156.   The Trusts were parties to the Redemption and the $1 Million Transfers and, upon information and belief, knowingly participated in and gave substantial assistance and encouragement to Kiminaia and Tierney to breach their Duty of Care and Duty of Loyalty for the benefit of the Trusts when they engaged in the Redemption and the $1 Million Transfers.

157.   At the time of the Redemption, Grossi owned and controlled 2210/305.

158.   At the time of the Redemption, 2210/305 was the beneficial owner of Grossi's membership interests in the Debtor.

159.   2210/305 was a party to the Redemption and, upon information and belief, knowingly participated in and gave substantial assistance and encouragement to Grossi to breach his Fiduciary Duties for the benefit of 2210/305 when it engaged in the Redemption.

160.   Upon information and belief, Tierney, Kiminaia, and/or the Trusts are the managers and/or members of or otherwise control ID and IM.

161.   At the time of the Redemption, ID and IM received the benefits of the Bill of Sale wherein they received $390,000 in value of the Debtor's personal property assets.

162.   Upon information and belief, ID and IM knowingly participated in and gave substantial assistance and encouragement to Grossi, Tierney, and Kiminaia to breach their fiduciary duties when Grossi caused the Debtor to execute the Bill of Sale and ID and IM accepted the transfer of $390,000 in value of the Debtor's personal property assets.

163.   Grossi, Tierney and Kiminaia's breaches of fiduciary duties that were aided and abetted by the Trusts, 2210/305, ID, and IM, and directly and proximately caused substantial damages to the Debtor, and its creditors, in an amount to be determined at trial.

34

164.     As a result of the Trusts, 2210/305, ID, and IM's aiding and abetting in the breaches of their fiduciary duties, the Debtor has been damaged in an amount that exceeds $50 million.

165.     Therefore, the Successor Trustee is entitled to a judgment against each of the Trusts, 2210/305, ID, and IM for aiding and abetting in the breaches of their fiduciary duties for an amount to be determined at trial.

**COUNT V**
**Breach of Duty of Care**
**Pursuant to 11 U.S.C. § 544 and M.C.L. §450.4404**
**(AS TO DEFENDANT GROSSI)**

166.     The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

167.     By virtue of Grossi's position as a manager of the Debtor, a fiduciary relationship existed between Grossi and the Debtor that continued after the Redemption.

168.     As a fiduciary, under the 2021 OA and Michigan law at MCL § 450.4404, Grossi owed the Debtor the Duty of Care.

169.     Prior to, concurrent with and subsequent to the Redemption, Grossi failed to exercise his Duty of Care to the Debtor by virtue of the following:

   a.  Grossi abdicated his independent duty to regularly monitor the Debtor's financial condition and performance.

   b.  Grossi took more than $3.2 million pursuant to draws, loan repayments and other expense reimbursements prior to, concurrent with and

35

following the Redemption and failed to consider the risks and benefits of taking such substantial compensation distributions.

c. Grossi allowed the Debtor to incur significant costs and expenses for lavish travel, sports and entertainment, meals and clothing expenses, as well as other uncategorized reimbursement expenses, without considering the negative impact to the Debtor.

d. Grossi failed to maintain accurate books and records and medical billing records to ensure that the Debtor realized all amounts due to it on account of its accounts receivable.

e. Grossi failed to keep himself apprised of applicable healthcare regulations governing the operation of the Debtor, thereby exposing the Debtor to potential significant damage, as set forth in proof of claims filed by the Government, which exposed the Debtor to significant legal challenges and substantial unsecured claims being asserted against the Debtor's estate.

170. As a result of Grossi's breach of the Duty of Care prior to, concurrent with, and following the Redemption as detailed above, the Debtor has been damaged in an amount that exceeds $50 million.

171. Therefore, the Successor Trustee is entitled to a judgment against Grossi for breaches of his Duty of Care for an amount to be determined at trial.

**COUNT VI**
**Breach of Duty of Loyalty**
**Pursuant to 11 U.S.C. § 544 and M.C.L. § 450.4404**
**(AS TO DEFENDANT GROSSI)**

172.   The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

173.   As a fiduciary under the 2021 OA and Michigan law at MCL § 450.4404, Grossi owed the Debtor the Duty of Loyalty.

174.   Grossi breached his Duty of Loyalty to the Debtor by looking out for his own self-interest, rather than the interests of the Debtor, in fulfilling various duties and responsibilities to the Debtor after the Redemption, that included, among other things, the following:

> a. Immediately prior to, concurrent with, and during the first year following the closing on the Redemption, Grossi took distributions from the Debtor characterized as draws that totaled $1.9 million without considering the impact of such distributions on the financial condition of the Debtor.

> b. During the first two years following the closing on the Redemption, Grossi incurred nearly $1.4 million in expenses for sports and entertainment expenditures, use of the Debtor's cash to purchase meals, clothing and expense reimbursement for other unknown and

37

unspecified expenses, all of which personally benefited Grossi to the detriment of the Debtor.

175. Grossi was the sole member and manager of the Debtor after the Redemption was closed and there were no disinterested members or managers of the Debtor at the time that Grossi caused the Debtor to take the actions described above that personally benefited Grossi at the Debtor's expense.

176. Upon information and belief, $1.0 million of the Grossi Transfers were transferred concurrent with and in connection the $1 Million Transfers to Tierney, Kiminaia and/or the Trusts, and therefore, there were no disinterested managers at the time that any of these transfers took place.

177. The Debtor was damaged due to Grossi's breach of his Duty of Loyalty in the amount of at least $50 million.

178. Therefore, the Successor Trustee is entitled to a judgment against Grossi for breaches of his Duty of Loyalty for an amount to be determined at trial.

<u>**COUNT VII**</u>
**Avoidance of Voidable Transactions Pursuant to**
**11 U.S.C. §544(b) and M.C.L. §§ 566. 34 (1)(a)**
**(AS TO ALL DEFENDANTS)**

179. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

180. Section 544(b) of the Bankruptcy Code allows a trustee as of the petition date to avoid and to set aside transfers of an interest of the Debtor in property or any

38

obligation incurred by the Debtor under applicable law that was held by a creditor of the Debtor as of the Petition Date.

181. The Uniform Voidable Transactions Act, M.C.L. § 566.31, *et seq*. constitutes applicable law under section 544(b) of the Bankruptcy Code that the Successor Trustee may utilize to avoid and set aside the Redemption Transfers and the Post-Redemption Compensation Transfer.

182. Pursuant to M.C.L. § 566.34(1) the Redemption Transfers and the Post-Redemption Compensation Transfer are avoidable to the Debtor's creditors that had claims that arose before or after the transfers were made or the obligations were incurred.

183. Unsecured creditors of the Debtor were in existence both prior to and after the Redemption Transaction and the Post-Redemption Compensation Transfer took place.

184. The Redemption Transfers and the Post-Redemption Compensation Transfer are avoidable pursuant to M.C.L. § 566.34(1)(a) as the Redemption Transfers and the Post-Redemption Compensation Transfer were made with actual intent to defraud the Debtor's creditors.

185. M.C.L. 566.34(2) prescribes the meaning of actual intent under 566.34(1)(a) and provides a non-exclusive list of factors commonly referred to as the "Badges of Fraud."

39

186.    The Badges of Fraud that apply in this Adversary Proceeding include but may not be limited to the following:

a.  The Redemption Transfers and the $1 Million Transfers were made to or for the benefit of the Redemption Defendants who, at the time of each of the Redemption Transfers, were insiders of the Debtor, as defined under M.C.L. § 566.31(i),

b.  The Post-Redemption Compensation Transfer was made to or for the benefit of Defendant Kiminaia, who, at the time was no longer employed by the Debtor, and thus, not entitled to compensation,

c.  The Debtor was insolvent at the time that the Redemption Transfers, $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer were made wherein, on the date the MIRA was signed, the amount of the Debtor's liabilities of at least $15 million exceeded the value of its assets of $4 million and at a time that the Debtor was generally not paying its debts as they came due.

d.  The Debtor became insolvent at the time that the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer were made.

e.  The Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer were made before or shortly

40

after the Debtor incurred substantial obligations to Comerica and Peninsula via the Redemption Financing.

187. Accordingly, the Transfers constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation M.C.L. § 566.34(a).

188. As a result of the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer, the Debtor was damaged in the approximate aggregate amount of more than $18.125 million by virtue of: (a) $7 million being transferred to Tierney and the Tierney Trust, (b) $7 million being transferred to Kiminaia and the Kiminaia Trust, (c) $700,000 being transferred to Sattar for the benefit of satisfying personal obligations owed by Grossi, Kiminaia and Tierney to Sattar, (d) the forgiveness of $355,000 in loans owed by Kiminaia, Tierney and/or the Trusts to the Debtor, (e) payments of at least $114,009.19 during the one year period following the closing on the Redemption that represented interest payments due Kiminaia and/or the Kiminaia Trust under the Note Obligation, (f) payments of at least $114,009.19 during the one year period following the closing on the Redemption that represented interest payments due Tierney and/or the Tierney Trust under the Note Obligation, (g) $390,000 in value of personal property assets that the Debtor transferred to ID and IM pursuant to the Bill of Sale as part of the Redemption, (h) the $1 Million

Transfers, (i) the $225,000 Transfers, and (j) the Post-Redemption Compensation Transfer in the amount of $222,378 to Kiminaia.

189. Accordingly, the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation M.C.L. § 566.34 (b).

190. Therefore, the Successor Trustee is entitled to a judgment against Sattar, ID, IM, and each of the Redemption Defendants for avoidance of each of the Redemption Transfers, the $1 Million Transfers. the $225,000 Transfers and the Post-Redemption Compensation Transfer for an amount to be determined at trial.

<u>**COUNT VIII**</u>
**Avoidance of Voidable Transactions Pursuant to**
**11 U.S.C. §544(b) and M.C.L. §§ 566. 34(1)(b)**
**(AS TO DEFENDANTS SATTAR, GROSSI, KIMINAIA, TIERNEY,**
**KIMINAIA TRUST, AND TIERNEY TRUST)**

191. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

192. The Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer are also avoidable pursuant to M.C.L. § 566.34(1)(b) as the Debtor did not receive reasonably equivalent value for these transfers.

42

193. The Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer were made at a time that the Debtor was engaged or about to be engaged in a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the transaction.

194. The Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer were made at a time that the Debtor intended to incur or reasonably should have believed that the Debtor would incur debts beyond its ability to pay as they became due.

195. Sattar did not receive the $700,000 Transfer in good faith or for a reasonably equivalent value.

196. Neither Tierney, Kiminaia or the Trusts received the Redemption Transfers, the $1 Million Transfers or the $225,000 Transfers in good faith or for a reasonably equivalent value.

197. Kiminaia did not receive the Post-Redemption Compensation Transfer in good faith and for reasonably equivalent value.

198. At the time of the closing on the Redemption, the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer made in connection therewith, the Debtor transferred almost $18 million to the Redemption Defendants and took on the Redemption Financing in the amount of almost $15 million, leaving the Debtor with only $4 million in assets.

199.   As a result of the Redemption and, particularly the Redemption Financing, as well as the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer, the Debtor intended to incur debts beyond its ability to pay such debts as they became due.

200.   As a result of the Redemption and, particularly the Redemption Financing, the Debtor believed or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

201.   Thereafter, the Debtor was rendered insolvent as a result of the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer.

202.   In fact, following the Redemption Financing, the Debtor was unable to pay its debts as they became due.

203.   Accordingly, the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation M.C.L. § 566.34 (b).

204.   As a result of the Redemption Transfers the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer, the Debtor was damaged in the approximate aggregate amount of more than $18.125 million by virtue of: (a) $7 million being transferred to Tierney and the Tierney Trust, (b) $7 million being

transferred to Kiminaia and the Kiminaia Trust, (c) $700,000 being transferred to Sattar for the benefit of satisfying personal obligations owed by Grossi, Kiminaia and Tierney to Sattar, (d) the forgiveness $355,000 in loans owed by Kiminaia, Tierney and/or the Trusts owed to the Debtor, (e) payments of at least $114,009.19 during the one year period following the closing on the Redemption that represented interest payments due Kiminaia and/or the Kiminaia Trust under the Note Obligation, (f) payments of at least $114,009.19 during the one year period following the closing on the Redemption that represented interest payments due Tierney and/or the Tierney Trust under the Note Obligation, (g) $390,000 in value of personal property assets that the Debtor transferred to ID and IM pursuant to the Bill of Sale as part of the Redemption, (h) the $1 Million Transfers, (i) the $225,000 Transfers and (j) the Post-Redemption Compensation Transfer to Kiminaia.

205. Therefore, the Successor Trustee is entitled to a judgment against Sattar, ID, IM, and each of the Redemption Defendants for avoidance of each of the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer for an amount to be determined at trial.

### COUNT IX
**Avoidance of Voidable Transactions Pursuant to**
**11 U.S.C. §544(b) and M.C.L. § 566. 35(2)**
**(AS TO DEFENDANTS TIERNEY, KIMINAIA AND THE TRUSTS)**

206. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

45

207. The Successor Trustee may avoid and set aside the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer to the extent that any of the Debtor's creditors had claims that arose before they were made, and provided that they were made to satisfy an antecedent debt to insiders. M.C.L. § 566.35(2).

208. Upon information and belief, prior to the Redemption Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer, the Debtor had numerous unsecured creditors holding allowable claims.

209. Upon information and belief, the $1 Million Transfers, the $225,000 Transfer and the Post-Redemption Compensation Transfer were made by the Debtor on account of an antecedent obligation owed to Tierney, Kiminaia and/or their Trusts.

210. On December 31, 2019, the Redemption Obligations created an obligation of the Debtor to Tierney, Kiminaia and/or the Trusts, all of whom were insiders of the Debtor as defined in MCL 566.31(i).

211. At the time of payment on or satisfaction of each of the Redemption Obligations (specifically, the MIRA and the Note Obligations) on and after January 19, 2021, the Redemption Obligations were antecedent debts.

212. On January 19, 2021, the Debtor transferred approximately $7 million to Tierney and/or the Tierney Trust, in order to satisfy the antecedent debt of the MIRA.

213.   During 2021, the Debtor transferred approximately $114,009.19 to Tierney and/or the Tierney Trust, in order to satisfy the antecedent debt of the Note Obligations.

214.   On January 19, 2021, the Debtor transferred approximately $7 million to Kiminaia and/or the Kiminaia Trust, in order to satisfy the antecedent debt of the MIRA.

215.   During 2021, the Debtor transferred approximately $114,009.19 to Kiminaia and/or the Kiminaia Trust, in order to satisfy the antecedent debt of the Note Obligations.

216.   Accordingly, the $14 Million Transfer, the Note Obligation Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation, MCL § 566.35(2).

217.   Therefore, the Successor Trustee is entitled to a judgment against Tierney, Kiminaia, and the Trusts for avoidance of the $14 Million Transfer, the Note Obligation Transfers, the $1 Million Transfers, the $225,000 Transfers and the Post-Redemption Compensation Transfer for an amount to be determined at trial.

## COUNT X
### Avoidance of Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A)
### (AS TO DEFENDANTS TIERNEY, KIMINAIA AND THE TRUSTS)

218.   The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

47

219. Section 548(a)(1)(A) of the Bankruptcy Code allows the Successor Trustee to avoid any transfer or any interest of the debtor in property, or any obligations incurred by the debtor with actual intent to hinder, delay, or defraud any creditor to which the Debtor was or became obligated, on or after the date that such transfer was made or such obligation was incurred.

220. Upon information and belief, Tierney and/or the Tierney Trust, received $83,666.64 for the Note Obligation Payments within two years of the Petition Date (the "Tierney Two Year Transfers").

221. Upon information and belief, Kiminaia and/or the Kiminaia Trust, received $83,666.64 for the Note Obligation Payments within two years of the Petition Date (the "Kiminaia Two Year Transfers").

222. Upon information and belief, Debtor paid Kiminaia some or all of the Post-Redemption Compensation Transfer within two years of the Petition Date.

223. Upon information and belief, the Tierney Two Year Transfers, the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer were made with actual intent to hinder, delay or defraud the creditors of the Debtor.

224. Upon information and belief, the Debtor received less than a reasonably equivalent value in exchange for the Tierney Two Year Transfers .

48

225. Upon information and belief, the Debtor received less than a reasonably equivalent value in exchange for the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer.

226. The Debtor was insolvent or rendered insolvent as a result of the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer.

227. The Debtor was insolvent or rendered insolvent as a result of the Tierney Two Year Transfers.

228. The Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer occurred shortly after the Debtor incurred the Redemption Obligations.

229. The Tierney Two Year Transfers occurred shortly after the Debtor incurred the Redemption Obligations.

230. The Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer occurred shortly after the Debtor obtained the Redemption Financing of more than $15 million.

231. The Tierney Two Year Transfers occurred shortly after the Debtor obtained the Redemption Financing of more than $15 million.

232. When the Debtor made the Tierney Two-Year Transfers, they were made to or for the benefit of Tierney and/or the Tierney Trust who were insiders of the Debtor.

49

233. When the Debtor made the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer, they were made to or for the benefit of Kiminaia and/or the Kiminaia Trust who were insiders of the Debtor.

234. The Tierney Two Year Transfers damaged the Debtor in the amount of $83,666.64 and constituted avoidable transfers that may be set aside under section 548(a)(1)(A) of the Bankruptcy Code.

235. The Kiminaia Two Year Transfers damaged the Debtor in the amount of $83,666.64 plus some or all of the Post-Redemption Compensation Transfer and constituted avoidable transfers that may be set aside under section 548(a)(1)(A) of the Bankruptcy Code.

236. Therefore, the Successor Trustee is entitled to a judgment against Kiminaia, Tierney and/or the Trusts for avoidance of the Kiminaia Two-Year Transfers, the Post-Redemption Compensation Transfer and the Tierney Two Year Transfers for an amount to be determined at trial.

### COUNT XI
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B)**
**(AS TO DEFENDANTS TIERNEY, KIMINAIA AND THE TRUSTS)**

237. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

238. Section 548(a)(1)(B) of the Bankruptcy Code allows the Successor Trustee to avoid any voluntary or involuntary transfer of an interest of the debtor in property, or

50

any obligation incurred by the debtor, that was made or incurred on or within two years before the petition date, if the debtor (i) received less than a reasonably equivalent value in exchange for such transfer or obligation, and (ii) (I) was insolvent on the date such transfer was made or such obligation incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, outside the ordinary course of business.

239. Upon information and belief, Tierney and/or the Tierney Trust, received the Tierney Two-Year Transfers within two years of the Petition Date.

240. Upon information and belief, Kiminaia and/or the Kiminaia Trust, received the Kiminaia Two-Year Transfers and some or all of the Post-Redemption Compensation Transfer within two years of the Petition Date.

241. Upon information and belief, the Debtor received less than a reasonably equivalent value in exchange for the Tierney Two Year Transfers.

242. Upon information and belief, the Debtor received less than a reasonably equivalent value in exchange for the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer.

51

243.   The Debtor was insolvent or rendered insolvent as a result of the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer.

244.   The Debtor was insolvent or rendered insolvent as a result of the Tierney Two Year Transfers.

245.   At the time of the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer, upon information and belief, the Debtor's debts were beyond the Debtor's ability to pay as they came due during the two years immediately preceding the Petition Date.

246.   At the time of the Tierney Two Year Transfers, upon information and belief, the Debtor's debts were beyond the Debtor's ability to pay as they became due during the two years immediately preceding the Petition Date.

247.   At the time of the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer, upon information and belief, the Debtor engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

248.   At the time of the Tierney Two Year Transfers, upon information and belief, the Debtor was engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

249.    At the time of the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer, upon information and belief, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

250.    At the time of the Tierney Two Year Transfers, upon information and belief, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

251.    When the Debtor made the Tierney Two-Year Transfers, they were made to or for the benefit of Tierney and/or the Tierney Trust who were insiders of the Debtor.

252.    When the Debtor made the Kiminaia Two Year Transfers and the Post-Redemption Compensation Transfer, they were made to or for the benefit of Kiminaia and/or the Kiminaia Trust who were insiders of the Debtor.

253.    The Tierney Two Year Transfers damaged the Debtor in the amount of $83,666.64 and constituted avoidable transfers that may be set aside under section 548(a)(1)(B) of the Bankruptcy Code.

254.    The Kiminaia Two Year Transfers damaged the Debtor in the amount of $83,666.64 plus some or all of the Post-Redemption Compensation Transfer and constituted avoidable transfers that may be set aside under section 548(a)(1)(B) of the Bankruptcy Code.

53

255. Therefore, the Successor Trustee is entitled to a judgment against Kiminaia, Tierney and/or the Trusts for avoidance of the Kiminaia Two-Year Transfers and the Tierney Two Year Transfers for an amount to be determined at trial.

## COUNT XII
### Avoidance of Preferential Transfers to Insiders
### Pursuant to 11 U.S.C. § 547(b)
### (AS TO DEFENDANTS GROSSI AND/OR 2210/305)

256. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

257. Pursuant to section 547(b) of the Bankruptcy Code, the Successor Trustee may avoid and set aside transfers that were made to an insider within one year of the petition date on account of an antecedent debt while the Debtor was insolvent and where the transfer enabled an insider to receive more than the insider would receive if (a) the transfer were made in a chapter 7 bankruptcy case, (b) the transfer had not been made, and (c) had the insider received a payment on the debt to the extent provided by the Bankruptcy Code.

258. The One-Year Transfers identified in attached **Exhibit A** were made to Grossi, individually or through 2210/305, within one year prior to the Petition Date.

259. Grossi and 2210/305 are insiders of the Debtor as defined at section 101(31) of the Bankruptcy Code.

260. Upon information and belief, the One-Year Transfers were made by the Debtor to Grossi, individually, or through 2210/305 on account of an antecedent debt

54

before such transfers were made and include transfers that the Debtor categorized as loan repayments and expense reimbursements to Grossi and/or 2210/305.

261.  The One-Year Transfers were made when the Debtor was insolvent.

262.  Pursuant to section 547(f) of the Bankruptcy Code, the Debtor is presumed to have been insolvent on and during the 90 days immediately preceding the Petition Date.

263.  Upon information and belief, the transfer of the One-Year Transfers enabled Grossi, individually or through 2210/305 to receive more than they would have received if (a) the case were a case under chapter 7 of the Bankruptcy Code, (b) the One Year Transfers had not been made, and (c) Grossi, individually, or through 2210/305 received payment of such debt to the extent provided by the Bankruptcy Code.

264.  The Debtor was damaged in the amount of $603,282.16 as a result of the One-Year Transfers.

265.  Therefore, the Successor Trustee is entitled to a judgment against Grossi, individually or through 2210/305, for the One-Year Transfers for an amount to be determined at trial.

### COUNT XIII
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A)**
**(AS TO DEFENDANTS GROSSI AND 2210/305)**

266.  The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

55

267. Pursuant to section 548(a)(1)(A) of the Bankruptcy Code, the Successor Trustee may avoid the Two-Year Transfers reflected on attached **Exhibit B** as transfers by the Debtor to Grossi, individually or through 2210/305, within two years of the Petition Date.

268. The Two-Year Transfers were made with actual intent to hinder, delay or defraud the creditors of the Debtor.

269. The Two-Year Transfers were made to Grossi and/or 2210/305 who were both insiders of the Debtor.

270. The Debtor received less than a reasonably equivalent value in exchange for the Two-Year Transfers.

271. The Two-Year Transfers occurred shortly after the Debtor incurred the Redemption Obligations.

272. The Two-Year Transfers occurred shortly after the Debtor obtained the Redemption Financing of more than $15 million.

273. The Debtor's liabilities exceeded its assets at the time that each of the Two-Year Transfers were made, and therefore, the Debtor was insolvent at the time of the Two-Year Transfers.

274. The Debtor became insolvent as a result of the Two-Year Transfers.

275. Upon information and belief, the Debtor incurred substantial obligations in 2021 that far exceeded its operating revenue and experienced operating losses of more than $9 million in 2022.

276. The Two-Year Transfers damaged the Debtor in the amount of $2,165,003.95.

277. The Two-Year Transfers constituted avoidable transfers that may be set aside under section 548(a)(1)(A) of the Bankruptcy Code.

278. Therefore, the Successor Trustee is entitled to a judgment against Grossi and/or 2210/305 for avoidance of the Two-Year Transfers for an amount to be determined at trial.

<u>**COUNT XIV**</u>
**Avoidance of Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B)**
**(AS TO DEFENDANTS GROSSI AND 2210/305)**

279. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

280. Pursuant to section 548(a)(1)(B) of the Bankruptcy Code, the Successor Trustee may avoid the Two-Year Transfers, reflected on attached **Exhibit B**, as transfers by the Debtor to Grossi, individually or through 2210/305, within two years of the Petition Date.

281. The Two-Year Transfers to Grossi and/or 2210/305 were made to or for the benefit of an insider or the Debtor incurred such obligation to or for the benefit of an insider.

282. The Two-Year Transfers were not made in the ordinary course of the Debtor's business.

283. The Debtor received less than a reasonably equivalent value in exchange for the Two-Year Transfers.

284. The Debtor's liabilities exceeded its assets at the time that each of the Two-Year Transfers were made, and therefore, the Debtor was insolvent at the time of the Two-Year Transfers or became insolvent as a result of the Two-Year Transfers.

285. Upon information and belief, the Debtor incurred substantial obligations in 2021 that far exceeded its operating revenue and experienced operating losses of more than $9 million in 2022.

286. The Debtor's debts were beyond the Debtor's ability to pay as they came due during the two years immediately preceding the Petition Date.

287. The Two-Year Transfers were made at a time when the Debtor engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

288. The Two-Year Transfers damaged the Debtor in the amount of $2,165,003.95.

58

289. The Two-Year Transfers constituted avoidable transfers that may be set aside under section 548(a)(1)(B) of the Bankruptcy Code.

290. Therefore, the Successor Trustee is entitled to a judgment against Grossi and/or 2210/305 for avoidance of the Two-Year Transfers for an amount to be determined at trial.

**COUNT XV**
**Avoidance of Post-Petition Transfers**
**Pursuant to 11 U.S.C. § 549(a)**
**(AS TO DEFENDANTS GROSSI AND/OR 2210/305)**

291. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

292. The Successor Trustee may avoid post-petition transfers of property of the estate not authorized by the Bankruptcy Code or by the Court pursuant to section 549(a) of the Bankruptcy Code.

293. Grossi, individually or through 2210/305 received the Post-Petition Transfers, identified on attached **Exhibit C,** as an initial, immediate or mediate transferee, without authorization by the Bankruptcy Code or the Court.

294. The Successor Trustee is entitled to avoid the Post-Petition Transfers made by the Debtor to Grossi, individually or through 2210/305 under section 549(a) of the Bankruptcy Code.

295. The Post-Petition Transfers damaged the Debtor in the amount of $38,131.14.

59

296.    Therefore, the Successor Trustee is entitled to a judgment against Grossi, individually or through 2210/305 for avoidance of the Post-Petition Transfers for an amount to be determined at trial.

**COUNT XVI**
**Avoidance of Voidable Transactions Pursuant to**
**11 U.S.C. §544(b) and M.C.L. § 566. 34(1)(a)**
**(AS TO DEFENDANTS KIMINAIA, GROSSI AND 2210/305)**

297.    The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

298.    The Successor Trustee may avoid the Six-Year Transfers, reflected on attached **Exhibit D**, and the Post-Redemption Compensation Transfer pursuant to M.C.L. § 566. 34(1)(a).

299.    For purposes of M.C.L. § 566.34(1)(a), unsecured creditors of the Debtor were in existence both prior to and after the Six-Year Transaction and the Post-Redemption Transfer took place.

300.    The Six-Year Transfers were made with actual intent, delay or defraud the creditors of the Debtor.

301.    The Six-Year Transfers were made to or for the benefit of Grossi and/or 2210/305, who at the time of each of the Six-Year Transfers were insiders of the Debtor, as defined under MCL 566.31(i).

302.    The Post-Redemption Compensation Transfer was made to or for the benefit of Kiminaia.

60

303. At the time of the Six-Year Transfers and the Post-Redemption Compensation Transfer, the Debtor's liabilities exceeded the value its assets and therefore, the Debtor was insolvent.

304. At the time of the of the Six-Year Transfers and the Post-Redemption Compensation Transfer the Debtor became insolvent as a result of the Six-Year Transfers and the Post-Redemption Compensation Transfer.

305. The Six-Year Transfers and the Post-Redemption Compensation Transfer occurred shortly before or after the Debtor incurred obligations in excess of $15 million to Comerica and Peninsula.

306. Accordingly, the Six-Year Transfers and the Post-Redemption Compensation Transfer constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation M.C.L. § 566.34(a) *et seq.*

307. As a result of the Six-Year Transfers, the Debtor was damaged in the amount of the $1,192,000.

308. As a result of the Post-Redemption Transfer, the Debtor was damaged in the amount of $222,378.

309. Therefore, the Successor Trustee is entitled to judgment against Grossi and/or 2210/305 for avoidance of each of the Six-Year Transfers and against Kiminaia

for avoidance of the Post-Redemption Compensation Transfer for an amount to be determined at trial.

## COUNT XVII
**Avoidance of Voidable Transactions Pursuant to**
**11 U.S.C. §544(b) and M.C.L. § 566. 34(1)(b)**
**(AS TO DEFENDANTS KIMINAIA, GROSSI AND 2210/305)**

310.    The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

311.    The Successor Trustee may avoid the Six-Year Transfers, reflected on attached **Exhibit D**, and the Post-Redemption Compensation Transfer pursuant to M.C.L. § 566. 34(1)(b).

312.    For purposes of M.C.L. § 566. 34(1)(b), unsecured creditors of the Debtor were in existence both prior to and after the Six-Year Transaction and the Post-Redemption Compensation Transfer took place.

313.    Neither Grossi nor 2210/305 received the Six-Year Transfers in good faith or for a reasonably equivalent value.

314.    Kiminaia did not receive the Post-Redemption Compensation Transfer in good faith and for a reasonably equivalent value.

315.    Each of the Six-Year Transfers and the Post-Redemption Compensation Transfer was made at a time when the Debtor was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to such business or transaction.

62

316. At the time of that the Six-Year Transfers and the Post-Redemption Compensation Transfer were made, the Debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due thereafter or was rendered insolvent as a result of the Six-Year Transfers.

317. Accordingly, the Six-Year Transfers and the Post-Redemption Compensation Transfer constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation M.C.L. § 566.34 (b), *et seq.*

318. As a result of the Six-Year Transfers, the Debtor was damaged in the amount of the $1,192,000.

319. As a result of the Post-Redemption Compensation Transfer, the Debtor was damaged in the amount of $222,378.

320. Therefore, the Successor Trustee is entitled to judgment against Grossi and/or 2210/305 for avoidance of each of the Six-Year Transfers and against Kiminaia for avoidance of the Post-Redemption Compensation Transfer, each for an amount to be determined at trial.

**<ins>COUNT XVIII</ins>**
**Avoidance of Voidable Transactions Pursuant to**
**11 U.S.C. §544(b) and M.C.L. § 566. 35(2)**
**(AS TO DEFENDANT GROSSI)**

321.    The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

322.    Pursuant to section 544(b) of the Bankruptcy Code, the Successor Trustee may avoid and set aside the Grossi Transfers, as reflected in **Exhibits A, B and D**, to the extent that any of the Debtor's creditors had claims that arose before the Grossi Transfers were made, and provided that the Grossi Transfers were made to satisfy an antecedent debt to insiders. M.C.L. § 566.35(2).

323.    Upon information and belief, prior to the Grossi Transfers, the Debtor had numerous unsecured creditors holding allowable claims.

324.    The Grossi Loans and all amounts that Grossi advanced for expenses on behalf of the Debtor, each became antecedent debts of the Debtor.

325.    To the extent that the Grossi Transfers were made for actual loan repayments or expense reimbursements, some or all of the Grossi Transfers were made in order to satisfy the Debtor's antecedent debts.

326.    Accordingly, the Grossi Transfers, constitute avoidable transfers that may be set aside pursuant to section 544(b) of the Bankruptcy Code and applicable state law, including without limitation, MCL § 566.35(2).

327.    Therefore, the Successor Trustee is entitled to a judgment against Grossi, for avoidance of the Grossi Transfers for an amount to be determined at trial.

## COUNT XIX
### Recovery of Unlawful Distributions
### Pursuant to 11 U.S.C. §544(b),
### M.C.L. §§ 450.4307 and 450.4308(1) and (3)
### (AS TO DEFENDANT GROSSI)

328. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

329. M.C.L. § 450.4307 prohibits a limited liability company from making distributions to its members if, after giving effect to the distribution, the limited liability would be insolvent.

330. An action to recover unlawful distributions may be initiated for unlawful distributions made within two years of the date of the action. M.C.L. § 450.4308(5).

331. For actions that were not barred by a statute of limitations on the petition date, section 108(a)(2) of the Bankruptcy Code extends the deadline for initiating causes of action for two years following the bankruptcy petition date.

332. The Two-Year Transfers, as reflected in attached **Exhibit B**, were made within two years of the Petition Date, therefore, the Successor Trustee's request for avoidance of the Two-Year Transfers as unlawful distributions under the Michigan Limited Liability Act is timely.

333. A limited liability company is determined to be insolvent if the company would not be able to pay its debts as they become due in the usual course of business. M.C.L. § 450.4307(1)(a).

334. Alternatively, a limited liability company is determined to be insolvent where, according to the company's balance sheet, its liabilities exceed its assets. M.C.L. § 450.4307(1)(b).

335. The effect of a distribution is measured at the date the distribution is made.

336. Upon information and belief, some or all of the Two-Transfers were paid to 2210/305, a member of the Debtor.

337. Some or all of the Two-Year Transfers should be recharacterized as member distributions.

338. All of the Two-Year Transfers were made at a time that, according to the Debtor's balance sheet, the Debtor's liabilities exceeded its assets, and therefore, the Debtor was insolvent at the time each of that the Two-Year Transfers were made.

339. All of the Two-Year Transfers were made at a time that the Debtor was unable to pay its debts as they came due in the ordinary course of business, and therefore, the Debtor was insolvent at the time each of the Two-Year Transfers were made.

340. Grossi was the only manager of the Debtor at the time the Two-Year Transfers were made who could approve the Two-Year Transfers.

341. 2210/305 was the only member of the Debtor at the time the Two-Year Transfers were made who could approve the Two-Year Transfers.

66

342. 2210/305 was owned and/or controlled by Grossi at the time the Two-Year Transfers were made.

343. Grossi and/or 2210/305 accepted and received the Two-Year Transfers with knowledge that the Two-Year Transfers violated the 2021 OA which prohibited distributions if the Debtor "would not be able to pay its debts as they become due in the usual course of business or the Company's total assets would be less than the sum of its total liabilities." (2021 OA at 6.2).

344. Grossi and/or 2210/305 accepted and received the Two-Year Transfers with knowledge that the Two-Year Transfers violated M.C.L. § 450.4307.

345. Grossi and 2210/305 are jointly and severally liable for the Two-Year Transfers that were made. M.C.L. §§ 450.4308(1),

346. The Successor Trustee is entitled to recover the value of the Two-Year Transfers against Grossi and/or 2210/305 plus interest, pursuant to section 544(b) of the Bankruptcy Code and M.C.L. §§ 450.4308(1), (2) and sections 542 and 550 of the Bankruptcy Code and applicable state and non-bankruptcy law.

347. Therefore, the Successor Trustee is entitled to a judgment against Grossi, for damages caused by the Grossi Transfers for an amount to be determined at trial.

### COUNT XX
### Recovery of Avoidable Transfers
### Pursuant to 11 U.S.C. § 550(a)(1) and (2)
### (AGAINST ALL DEFENDANTS)

348.   The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

349.   The Redemption Transfers (which includes the $700,000 Transfer), the Tierney Two-Year Transfers, the Kiminaia Two-Year Transfers, the Grossi Transfers, the One-Year Transfers, the Two-Year Transfers, the Six-Year Transfers, the $1 Million Transfers, the $225,000 Transfers, the Post-Redemption Compensation Transfer and the Post-Petition Transfers (collectively, the "Transfers"), as reflected on attached **Exhibit E**, were made to or for the benefit of Grossi, 2210/305, ID, IM, Tierney, Kiminaia, the Kiminaia Trust, the Tierney Trust and Sattar.

350.   Pursuant to section 550 of the Bankruptcy Code and applicable state and non-bankruptcy law, the Successor Trustee is entitled to avoid and recover the Transfers and the benefits therefrom from any and all initial, immediate, or mediate transferees.

351.   Upon information and belief, Grossi, 2210/305, ID, IM, Tierney, Kiminaia, the Kiminaia Trust, the Tierney Trust and Sattar are the initial, immediate, or mediate transferees of the Transfers.

352.   The Successor Trustee is entitled to recover the value of the Transfers and benefits as detailed hereinabove, plus interest, pursuant to section 550 of the Bankruptcy Code and applicable state and non-bankruptcy law.

353. Therefore, the Successor Trustee is entitled to a judgment against Grossi, 2210/305, ID, IM, Tierney, Kiminaia, the Kiminaia Trust, the Tierney Trust and Sattar, for recovery of the Transfers for an amount to be determined at trial.

## COUNT XXI
**Recharacterization of Debt**
**Pursuant to 11 U.S.C. § 105**
**(AS TO DEFENDANT GROSSI)**

354. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

355. Pursuant to the equitable powers conveyed to the Court by section 105 of the Bankruptcy Code, the Court can look beyond the form of the transaction and consider the transaction's substance to determine whether it should be recharacterized from debt to equity.

356. Grossi was at all relevant times an "insider" of the Debtor.

357. Grossi, at all relevant times after the Redemption, was the only manager of the Debtor and had substantial and significant control and influence over all of the Debtor's business decisions.

358. At all relevant times after the Redemption, Grossi controlled the Debtor's decision-making process related to the Grossi Loans while sitting on both sides of the transaction.

359. As more fully described above, the purported Grossi Loans do not contain the hallmarks of a loan.

360. The Debtor did not execute a promissory note or other loan documents memorializing the Grossi Loans.

361. The Debtor did not make regular payments or incur interest on the Grossi Loans.

362. The Grossi Loans were made at a time when the Debtor was undercapitalized, and no other creditor was willing to extend credit.

363. In order to achieve justice, the Grossi Loans should be classified as equity, and not as debt.

364. Therefore, the Successor Trustee is entitled to a judgment against Grossi for equitable relief to be determined at trial.

**COUNT XXII**
**Equitable Subordination of Claims**
**Pursuant to 11 U.S.C. § 510(c)**
**(AS TO DEFENDANT GROSSI)**

365. The allegations set forth elsewhere in the First Amended Complaint are incorporated by reference herein as if stated herein in their entirety.

366. Pursuant to section 510(c) of the Bankruptcy Code, the Court may subordinate distribution of an allowed claim under the principles of equitable subordination.

367. Equitably subordinating the Grossi Loans is consistent with the section 510 and other provisions of the Bankruptcy Code.

368. Grossi, at all relevant times after the Redemption, was the only manager of the Debtor and had access to and monitored the Debtor's financial information and had substantial and significant control and influence over all of the Debtor's business decisions.

369. Grossi was engaged in inequitable conduct when, despite his knowledge of the Debtor's declining financial health and its undercapitalization, Grossi breached his fiduciary duties by taking excessive compensation and paying hundreds of thousands of dollars in expenses for his personal benefit and in violation of applicable law.

370. As a result of Grossi's misconduct, the Debtor, the Liquidating Trust and the Debtor's general unsecured creditors have been injured.

371. Therefore, the Successor Trustee is entitled to a judgment against Grossi for equitable relief to be determined at trial.

## **RELIEF REQUESTED**

**WHEREFORE**, the Successor Trustee respectfully requests that the Court enter judgment, as set forth in the Counts above, including attorney's fees, costs and interest, to the extent provided under applicable law, plus all other just and equitable relief justified herein.

Respectfully submitted;

**TAFT STETTINIUS & HOLLISTER, LLP**

By: /s/ Kimberly Ross Clayson
Judith Greenstone Miller (P29208)
Kimberly Ross Clayson (P69804)
27777 Franklin Road, Suite 2500
Southfield, Michigan 49034
(248) 351-3000
jgmiller@taftlaw.com
kclayson@taftlaw.com

and

David H. Wallace (Ohio Bar No. 0037210)
*Pro Hac Vice Admission Pending*
200 Public Square Suite 3500
Cleveland, OH 44114-2302
(216) 241-2838
dwallace@taftlaw.com

Dated: December 20, 2024    *Counsel for Plaintiff, Jason W. Bank, solely in his capacity as Successor Trustee of the Ark Laboratory Trust*

In re:

ARK LABORATORY, LLC,                         Case No. 23-43403-MLO
                                             Chapter 11
     Debtor.                               Hon. Maria L. Oxholm
_____/
JASON W. BANK, SOLELY IN HIS
CAPACITY AS SUCCESSOR TRUSTEE
OF THE ARK LABORATORY TRUST,

       Plaintiff,                         Adv. P. No. 23-04496-MLO

   v.

JAMES A. GROSSI, an Individual,
2210/305 LLC, a Michigan limited liability
Company, BRIAN TIERNEY,
Individually and as Trustee of the
TIERNEY FAMILY TRUST DATED
12/21/2018, NAMEER KIMINAIA,
Individually and as Trustee of the NAMEER
KIMINAIA LIVING TRUST DATED 5/31/2019,
TIERNEY FAMILY TRUST DATED
12/21/2018, NAMEER KIMINAIA
LIVING TRUST DATED 5/31/2019,
HAMID SATTAR, ION DIAGNOSTICS, LLC, a
Michigan limited liability company, and ION
MARKETING, LLC, a Michigan limited liability
company,

      Defendants.
_____/

## CERTIFICATE OF SERVICE

    I hereby certify that on December 20, 2024, I caused to be served a copy of the

***First Amended Complaint*** and this ***Certificate of Service*** by using the Court electronic

filing system which will send notification of such filing to all parties listed on the ECF

list in the above-captioned case.

Respectfully submitted,

**TAFT STETTINIUS &
HOLLISTER, LLP**

By: */s/ Kimberly Ross Clayson*
Judith Greenstone Miller (P29208)
Kimberly Ross Clayson (P69804)
27777 Franklin Road, Suite 2500
Southfield, Michigan 49034
(248) 351-3000
jgmiller@taftlaw.com
kclayson@taftlaw.com

and

David H. Wallace
(Ohio Bar No. 0037210)
200 Public Square Suite 3500
Cleveland, OH  44114-2302
(216) 241-2838
dwallace@taftlaw.com

*Counsel for Plaintiff Jason W. Bank,
Solely in his Capacity as Successor
Trustee of the Ark Laboratory Trust*